1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF PUERTO RICO

3    ANTONIO RIVERA, et al.,
4
5         Plaintiffs,
6                                        Civil No. 08-1087 (JAF)
7         v.
8    CARIBBEAN PETROLEUM
9    CORPORATION,
10
11        Defendant.


12                     **<u>OPINION AND ORDER</u>**

13        Plaintiffs, Antonio Rivera, Marta Garatón, and the conjugal

14   partnership between them, bring this action against Defendant,

15   Caribbean Petroleum Corporation, alleging violations of the Petroleum

16   Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2841. (Docket

17   Nos. 1; 2-3.) Defendant moves for summary judgment under Federal Rule

18   of Civil Procedure 56(c) (Docket No. 21); Plaintiffs oppose. (Docket

19   No. 32.)

20                              **I.**

21               **<u>Factual and Procedural Synopsis</u>**

22        We derive the following facts from the parties' motions,

23   statements of uncontested material facts, and exhibits. (Docket

24   Nos. 21; 22; 23; 31; 32.) Plaintiffs are a husband and wife who

25   operate gasoline stations in Puerto Rico.  Rivera has been working in

26   the industry for over thirty years as a franchisee for various

27   petroleum companies. (Docket No. 22-2.) Defendant is a petroleum

1    corporation with its principal place of business in Bayamón, Puerto

2    Rico. Defendant markets petroleum under the "GULF" trademark and acts

3    as a franchisor. In 1998, Defendant entered into a fifteen-year lease

4    with Canóvanas Urban Development, Inc. ("CUDI") for a plot of land in

5    Canóvanas, Puerto Rico. As a condition of the lease, Defendant agreed

6    to construct a gasoline service station on the property. (Docket

7    No. 22-5.) The lease established a graduated rental scheme whereby

8    Defendant would pay CUDI $10,0000 per month for the first five years,

9    $12,000 per month in the succeeding five years, and $14,000 in the

10   final five years.  (Id.)

11       Defendant built the gas station as promised and then sublet the

12   station to a franchisee under a trial franchise agreement at a rent

13   of $6,000 per month. (Docket No. 22-5 at 4.) That franchisee did not

14   perform satisfactorily and, in 2000, Defendant began looking for

15   another franchisee to operate the station.

16       In October 2000, Defendant offered Plaintiffs the opportunity to

17   run the Canóvanas gas station rent-free. (Docket No. 22-5 at 4.)

18   Defendant concedes that it entered into an oral franchise agreement,

19   as defined by the PMPA, with Plaintiffs. (Docket No. 23 at 9.)

20   Plaintiffs agree that an oral contract governed their franchise

21   relationship. (Docket No. 22-3 at 55-56.) Plaintiffs took possession

22   of the Canóvanas gas station in October 2000 and have continued to

23   run the station through the present day.

1    Defendant insists that it had been trying to renegotiate its

2    rental payments under its lease with CUDI since 2003. In 2006, having

3    recently completed a bankruptcy reorganization, Defendant decided

4    that the rental payments for the Canóvanas station were

5    unsustainable. Defendant made its last rental payment in January 2006

6    and, in the words of its supervisor of retail sales, "still hoped

7    that CUDI would then reconsider and lower the monthly payments."

8    (Docket No. 22-5 at 6.)  Instead, CUDI began eviction proceedings on

9    April 20, 2006. (Docket No. 22-5 at 3.) Defendant consented to a

10   judgment of eviction on May 24, 2006. (Docket No. 22-6 at 9.)  On the

11   following day, Defendant notified Plaintiffs by mail of the loss of

12   the lease and gave Plaintiffs thirty days to vacate the property.

13   (Docket No. 22-7.)

14   Plaintiffs, however, remained on the property and eventually

15   purchased it from CUDI. On June 25, 2007, Plaintiffs filed a claim in

16   the Commonwealth Court of First Instance alleging wrongful

17   termination of the franchise under the PMPA. (Docket No. 2-3.)

18   Defendant removed the case to this court on January 18, 2008.

19   (Docket No. 1.)

20                                    **II.**

21                  **Summary Judgment under Rule 56(c)**

22   We grant a motion for summary judgment "if the pleadings, the

23   discovery and disclosure materials on file, and any affidavits show

24   that there is no genuine issue as to any material fact and the movant

1    is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

2    A factual dispute is "genuine" if it could be resolved in favor of

3    either party and "material" if it potentially affects the outcome of

4    the case. Calero-Cerezo v. DOJ, 355 F.3d 6, 19 (1st Cir. 2004).

5         The movant carries the burden of establishing that there is no

6    genuine issue as to any material fact. Celotex Corp. v. Catrett, 477

7    U.S. 317, 325 (1986). In evaluating a motion for summary judgment,

8    we view the record in the light most favorable to the non-movant.

9    Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "Once the

10   moving party has made a preliminary showing that no genuine issue of

11   material fact exists, the nonmovant must 'produce specific facts, in

12   suitable evidentiary form, to establish the presence of a trialworthy

13   issue.'" Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006)

14   (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2

15   (1st Cir. 1999)). The non-movant "may not rely merely on allegations

16   or denials in its own pleading; rather, its response must . . . set

17   out specific facts showing a genuine issue for trial." Fed. R. Civ.

18   P. 56(e)(2).

19                                **III.**

20                              **Analysis**

21        Plaintiffs argue that Defendant's eviction for nonpayment of

22   rent cannot be a valid lease "expiration" as contemplated by the

23   statute. (Docket No. 32 at 10.) Plaintiffs also aver that Defendant

24   did not comply with provisions of the PMPA requiring it to include in

1    the termination notice offers to assign any purchase option for the

2    underlying land or rights to equipment and improvements on the land.

3    (Docket No. 2-3 at 15.)  Defendant argues that its termination of

4    Plaintiffs' franchise was valid under the PMPA because its eviction

5    by CUDI was an "expiration of the underlying lease" for which

6    termination would be reasonable pursuant to 15 U.S.C. § 2802(c)(4).

7    (Docket No. 23 at 15-19.) With regard to the assignment offers,

8    Defendant first argues that its notice of termination was valid

9    because the PMPA does not require assignment offers to be contained

10   within the termination notice. (Docket No. 23 at 20.) Second,

11   Defendant argues that it had no purchase option for the land and that

12   it never received a request from Plaintiffs, as mandated by the PMPA,

13   for the assignment of improvements and equipment on the land.  (Id.)

14   **A.   Eviction as "expiration"**

15        The issue before us appears to be one of first impression in

16   this circuit: whether a franchisor's eviction for nonpayment of rent

17   qualifies as a "loss of the franchisor's right to grant possession of

18   the leased marketing premises through expiration of an underlying

19   lease." 15 U.S.C. § 2802(c)(4).  The PMPA prohibits the termination

20   of a petroleum franchise agreement unless said termination is

21   premised upon one of five enumerated reasons. § 2802(a), (b)(2). One

22   of these reasons is the "occurrence of an event which is relevant to

23   the franchise relationship and as a result of which termination of

24   the franchise relationship . . . is reasonable." § 2802(b)(2)(c).

1    The PMPA then offers a list of situations that qualify as such events

2    "relevant to the franchise relationship." § 2802(c). Any termination

3    that conforms to one of these situations is "conclusively presumed to

4    be reasonable as a matter of law." Desfosses v. Wallace Energy, Inc.,

5    836 F.2d 22, 26 (1st Cir. 1987). But the First Circuit, citing the

6    legislative history of the PMPA, cautions that this list is not

7    exclusive; rather, the PMPA allows courts to uphold franchise

8    terminations that do not perfectly conform to an event enumerated in

9    § 2802 yet are nonetheless reasonable. Id. at 27.

10        Section 2802(c)(4) sanctions termination of a petroleum

11   franchise where the franchisor has lost "the right to grant

12   possession of the leased marketing premises through expiration of an

13   underlying lease." The First Circuit broadly interprets the term

14   "expiration" to encompass losses of the lease that are voluntary or

15   involuntary. Veracka v. Shell Oil Co., 655 F.2d 445, 447-48 (1st Cir.

16   1981). In Veracka, the First Circuit rejected the argument that

17   § 2802(c)(4) applied only where the expiration of the underlying

18   lease was outside of the franchisor's control. Id. The Veracka court

19   analyzed the legislative history and found that while the purpose of

20   the PMPA was to correct a disparity in bargaining power between

21   franchisors and franchisees, "the exceptions are also broad,

22   reflecting an intent to allow reasonable business judgments by the

23   franchisor." Id.; accord Desfosses, 836 F.2d at 25 ("Congress was

24   also aware of the franchisors' need for adequate flexibility to

1    respond to changing market conditions and consumer preferences").

2    The _Veracka_ court found that Congress' chief concern was with a

3    franchisor terminating the franchise relationship solely to take

4    control of the franchise itself, "appropriating the benefit of the

5    goodwill that the franchisee had developed." 655 F.2d at 449. Thus,

6    the First Circuit held that the voluntary loss of a lease was an

7    "expiration" under § 2802(c)(4) where there was an arm's length

8    relationship between lessee and lessor and where there was a

9    substantive change in control of the premises. _Id._

10   The _Veracka_ decision has influenced the interpretation of

11   "expiration" under § 2802(c)(4) in several other circuits. _See_

12   _Mustang Mktg., Inc. v. Chevron Prod. Co._, 406 F.3d 600, 608 (9th Cir.

13   2005) (rejecting literal interpretation of "expiration of the

14   underlying lease" and instead scrutinizing "franchisor's subjective

15   intent, its continuing control over the marketing premises, and its

16   actual or eventual right to continued possession"); _PDV Midwest_

17   _Refining, L.L.C. v. Armada Oil & Gas Co._, 305 F.3d 498 (6th Cir.

18   2002) (holding that voluntary loss of a lease is reasonable grounds

19   for terminating a franchise agreement); _Hutchens v. Eli Roberts Oil_

20   _Co._, 838 F.2d 1138, 1142 (11th Cir. 1988) (voluntary cancellation of

21   an underlying lease in mid-term was an "expiration" under

22   § 2802(c)(4) because "the cause of the lease's termination is not

23   important . . . . Rather, we must be satisfied that the termination

24   represents an arms length transaction in which the franchisor

1   actually gives up control of the premises."); Russo v. Texaco, Inc.,

2   808 F.2d 221 (2d Cir. 1986) (applying the Veracka court's "voluntary

3   loss" of an underlying lease to the PMPA's "loss" of franchisor's

4   right to grant the use of a trademark under § 2802(c)(6)).

5        Plaintiffs' primary argument is that an eviction for non-payment

6   of rent is not an "expiration of the underlying lease" for purposes

7   of § 2802(c)(4). (Docket No. 32.)  We are unaware of any precedent in

8   the First Circuit addressing whether a franchisor's eviction is an

9   appropriate "loss of the right to grant possession" under

10  § 2802(c)(4).  Following Veracka and its progeny, we find no error in

11  a "voluntary loss" where there was an arm's length relationship

12  between the parties to the lease and where the franchisor truly ceded

13  control of the premises.  That Defendant was evicted because it

14  stopped paying rent does not affect our analysis.  Neither the PMPA

15  nor the cases interpreting it places any importance on the actual

16  cause of the underlying lease's expiration.  Instead, just as in

17  Veracka, we evaluate the nature of the lessor and lessee's

18  relationship and the franchisor's intent in terminating the

19  franchise.  655 F.3d at 449.  In the case before us, there is no

20  evidence that the relationship between Defendant and CUDI was

21  anything but at arm's length.  This was not a situation in which the

22  franchisor lost the lease only to be rid of the franchisee and take

23  the property for itself.  In fact, Plaintiffs never left the premises

24  and eventually bought the property from the lessor, CUDI.

1       Furthermore, Defendant's strategic breach of its lease with CUDI

2   was the sort of reasonable business decision that could justify a

3   franchise termination under the PMPA.  See Veracka, 655 F.2d at 448;

4   Desfosses, 836 F.2d at 25.  Defendant, having recently emerged from

5   bankruptcy, was paying an exorbitant rent on a property for which it

6   received no monthly rent from the franchisee.  Rivera even concedes

7   that Defendant had "a very bad deal . . . . [b]ecause that was an

8   exaggerated amount of rent." (Docket No. 22-3 at 4.) In such a

9   situation, it may be more reasonable for Defendant to breach the

10  lease and risk liability for any resulting damages than to add

11  another shovel-load to a deepening money pit.

12  **B.  "Notice" Violations**

13      Plaintiffs claim that notification of their franchise's

14  termination was faulty in that it "neither contained nor made any

15  mention of the possible transfer of any property right that

16  [Defendant] could have to the Plaintiff." (Docket No. 2-3 at 15.)

17  Defendant argues that the PMPA did not require it to mention any

18  transfer of property rights in its termination notice (Docket No. 23

19  at 20). In addition, Defendant states that it did not possess any

20  property right to assign in the land, and any rights to the

21  improvements thereon were not properly requested by Plaintiffs.

22  (Id.)

23      Plaintiffs' vague pleading could refer to either of two

24  different notice provisions in the PMPA. One, § 2802(c)(4)(B),

1    requires the franchisor to offer to assign to the franchisee any

2    option held by the franchisor to extend the underlying lease or to

3    buy the property.  The franchisor need not make this offer in the

4    notice of termination, but must make it within ninety days following

5    the notice.  <u>Id.</u>  The second provision is § 2802(c)(4)(C), which

6    requires the franchisor to make a bona-fide offer to sell any

7    improvements or equipment left on the land, following a written

8    request from the franchisee within thirty days' notice of

9    termination.

10       Defendant first argues that, despite the wording of Plaintiffs'

11   complaint, neither of these assignment offers must be made as part of

12   the termination notice; instead, both provisions require franchisor's

13   action during a set period subsequent to the termination notice.

14   (Docket No. 23 at 20.); <u>See</u> § 2802(c)(4)(B), (c)(4)(C). Second,

15   Defendant argues that there was no purchase option in the underlying

16   lease that could be assigned to Plaintiffs. (Docket No. 23 at 20.)

17   In support, Defendant submits its original lease with CUDI, which

18   contains no mention of a purchase option.  (Docket No. 22-5 at 9-41.)

19   Finally, Defendant states that Plaintiffs never sent it a written

20   request, as required by the § 2802(c)(4)(C), to purchase any

21   equipment or improvements left on the land by Defendant. (Docket

22   No. 23 at 20.) Plaintiffs have failed to respond to any of the above

23   arguments; nor have they "set out specific facts showing a genuine

24   issue for trial" as required by Rule 56(e)(2). (Docket No. 32.)

Civil No. 08-1087 (JAF)                                                    -11-

1   Lacking any challenge to Defendant's arguments that would give rise

2   to a genuine issue of material fact, we find, as a matter of law,

3   that Defendant has not violated either of these PMPA provisions.[1]

4                                    **IV.**

5                               **Conclusion**

6        For the aforementioned reasons, we hereby **GRANT** Defendant's

7   motion for summary judgment (Docket No. 21).  We **DISMISS** Plaintiffs'

8   claims under the PMPA (Docket No. 2-3) **WITH PREJUDICE.**

9        **IT IS SO ORDERED.**

10       San Juan, Puerto Rico, this 19th day of October, 2009.

11                                        s/José Antonio Fusté
12                                        JOSE ANTONIO FUSTE
13                                        Chief U.S. District Judge
14

---

[1] Although Plaintiffs failed to include it in their complaint, they reference an additional claim in their opposition to summary judgment. (Docket No. 32 at 7.) Plaintiffs appear to argue improper notice under § 2802(b)(2)(C), which limits the time frame in which a franchisor could have actual or constructive knowledge of the event that leads to its terminating the franchise. (Id.) Generally, courts cannot entertain claims on summary judgment which never appeared in the complaint. Ruíz-Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008). "The fundamental purpose of our pleadings rules is to protect a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." Id. (internal quotations omitted) (affirming summary judgment where claim was not sufficiently pleaded in amended complaint). Plaintiffs' claim was improperly pleaded and, therefore, we shall not consider it.